## Murdock et ux. *v.* Pennsylvania Railroad Company, Appellant.

Argued November 21, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Theodore Voorhees,* with him *Barnes, Myers & Price,* for appellant.

*Abraham Berkowitz,* for appellees.

OPINION BY STADTFELD, J., July 27, 1942:

The plaintiffs brought suit to recover damages for the death of their son, a boy twelve years and eight months of age, who was drowned on August 17, 1934, while swimming in a small pond on land of the Pennsylvania Railroad Company.

The pond was located in a swampy wasteland in South Philadelphia near the Delaware River at a point approximately 4,000 feet South of Oregon Avenue, the nearest built-up section of the City of Philadelphia. While there was some evidence that there was a shack within the distance of a block from the pool and that a small development known as Martin's Village was five or six blocks away, the photographs introduced in evidence by the defendant, the accuracy of which was acknowledged by plaintiffs' witnesses, show the entire surrounding terrain and fail to indicate the presence of any dwelling houses within a distance of approximately a mile.

The pond was described as being thirty by sixty feet and was estimated to range in depth from two to five or six feet. It was a natural pond and apparently had no source other than rainfall or seepage.

A work track of the Pennsylvania Railroad passed at a short distance from the pond. A similar work track of the Baltimore & Ohio Railroad Company was located within a distance of 100 feet. A private road to a coal dumper went by one end of the pond and this road was an extension of Delaware Avenue but had not been opened to the public.

Plaintiffs' son and a group of five or six other boys walked two miles from their homes, on the day in question, to swim in the pond. It was testified that approximately twenty other boys were in swimming when they arrived, and that many boys had swum in the pond for a period of several years, although the plaintiffs' son was there on the day in question for the first

time. The boys who were already at the pond departed when Murdock arrived and he and his group of friends then swam for about an hour. Thereafter, his companions came out of the water and left the pond to play in some trees which were some distance away. Murdock desired to continue swimming, and when the boys returned an hour later they found that he had drowned.

His father and the boys who accompanied him testified that Murdock was a good swimmer. One of the witnesses said that he did not believe the boy was in any danger when they left him there, and that if he had thought so they would have taken him along with them when they departed. There was no evidence as to what caused plaintiffs' son to drown. The statement of claim contained an averment that he had suffered an attack of cramps but there was no evidence at the trial to establish that fact, and the court permitted plaintiffs to amend the statement of claim to eliminate the averment.

The case came on for trial and the learned trial judge directed the jury to determine whether or not the pond constituted a playground, and if so whether the defendant had been guilty of negligence which caused Murdock's death. The jury returned a verdict in favor of the plaintiff in the sum of $2,000, and defendant, whose motion for a directed verdict in its favor had been refused, filed motions for judgment n. o. v. and for a new trial. Both of these motions were overruled. This appeal followed.

The allegations of negligence of defendant as set forth in plaintiffs' statements, upon which the case was tried are: "(a) The defendant failed to keep its premises in a safe condition; (b) The defendant failed to safeguard the rights and privileges of minor boys who used defendant's property as a playground; (c) In failing to have a watchman at aforesaid dangerous por-

tions of defendant's land, more particularly at said pool of water ......"[1].

The main question for our consideration is to ascertain in what respect the defendant was negligent in order to warrant a recovery. Plaintiffs base their right to recover on the theory applicable to so-called "playground" cases. An examination of these cases will show that the law does not require a land owner to take unduly burdensome precautions which are not commensurate with the risk involved, even if the playground rule should be held to apply.

The test to be applied in determining the existence of a playground is set forth in the case of *Fitzpatrick v. Penfield*, 267 Pa. 564, 109 A. 653, as follows: "The amount of use that will bring otherwise private ground within the playground rule must depend to a large extent on the circumstances of each case. It may be said that the use contemplated is such as to cause the place to be generally known in the *immediate vicinity* as a recreation center, and its occupancy should be shown to be of such frequency as to impress it with the obligation of ordinary care on the part of the owner." (Italics supplied)

The requirement of the rule which was missing in the case at bar was proof that the pond was "generally known in the immediate vicinity as a recreation center", it appearing that there were no persons living within a mile of the pond, and the boys who swam there being residents of a neighborhood lying approximately two miles away.

The importance of the establishment of a "reputation in the immediate vicinity" is obvious. In the decisions, where recovery was permitted for accidents on playgrounds, the locus in each instance immediately bordered both the homes of the children using the play-

---

[1] A fourth allegation that the defendant was negligent "in otherwise failing to protect" the minor was withdrawn.

grounds and the industrial or other establishments of the land owner. Thus, when recovery was permitted, it appeared clearly that the owner of the property knew of the playground, not only from the fact that it was actually within his view, but also from the fact that its use as such was known to all the people in the surrounding community. As a part of that community, he could not deny knowledge of the use of his property when it had acquired a reputation as a "recreation center" among those in his immediate neighborhood.

In the instant case, the witnesses testified that the pond was known as a swimming pool among the people in the neighborhood in which the boys lived. This was bounded by Snyder Avenue on the south, Reed Street on the north, and Third Street on the west, but this entire district, from which the swimmers came, was more than two miles from the pond.

Furthermore, there were no persons living in the immediate vicinity of the pond to see the boys swimmining there, the nearest built-up section of the city being above Oregon Avenue, more than 4,000 feet away. There was no office of the railroad within miles of the pond and nothing to charge its responsible officials with knowledge of the use which was being made of its property.

Several of the boys testified that on occasion while they were swimming, railroad employees had gone by the pond and that they had made no protest, but these men were track men who were working on the work track and who paid no attention to the boys and may not even have seen them. If this evidence amounts to anything, it is merely notice to the railroad that boys occasionally swam in the pool. It fell far short of establishing that the pool was known by the railroad to have become a recreation center. It should be noted, furthermore, that the witnesses failed to specify whether the trackmen were employees of the defendant or of

the Baltimore & Ohio Railroad Company, the tracks of which passed within 100 feet of the pond.

In the leading case of *Gillespie v. McGowan*, 100 Pa. 144, the owner of an abandoned brickyard left it in a dilapidated condition, and a disused well remained uncovered and unfenced, despite the fact that the surrounding field "was lying out in commons" and was being used "as a place of resort by children and adults". The plaintiff's seven year old son, was found drowned in the well and the father brought suit charging, as in the case at bar, that the owner of the property was "guilty of negligence in permitting the well to remain without a fence or guard of some kind to protect it." The jury returned a verdict for the plaintiff, but on appeal the Supreme Court set it aside and entered judgment for the defendant n. o. v. Justice PAXSON used the following language, which has been quoted in many subsequent cases dealing with accidents of this kind: "We are unable to see anything in this case to charge the defendants with negligence in not enclosing their lot or guarding the well. There was no concealed trap or dead fall, as in *Hydraulic Company v. Orr*, 83 Pa. 332. The well was open and visible to the eye. No one was likely to walk into it by day, and this accident did not occur at night. A boy playing upon its edge might fall in, just as he might in any pond or stream of water. In this respect the well was no more dangerous than the river front on both sides of the city where boys of all ages congregate in large numbers for fishing and other amusements. Vacant brick yards and open lots exist on all sides of the city. There are streams and pools of water where children may be drowned; there are inequalities of surface where they may be injured. To compel the owners of such property either to enclose it or fill up their ponds and level the surface so that trespassers may not be injured would be an oppressive rule. The law does not

require us to enforce any such principle even where the trespassers are children. We all know that boys of eight years of age indulge in athletic sports. They fish, shoot, swim, and climb trees. All of these amusements are attended with danger, and accidents frequently occur. It is part of a boy's nature to trespass, especially where there is tempting fruit, yet I never heard that it was the duty of the owner of a fruit tree to cut it down because a boy trespasser may possibly fall from its branches. Yet the principle contended for by the plaintiff would bring us to this absurdity if carried to its logical conclusion. Moreover, it would charge the duty of the protection of children upon every member of the community except their parents."

In *Le Grand v. Traction Co.,* 10 Pa. Superior Ct. 12, a thirteen year old boy was drowned while in swimming in a pond in a public amusement park. At the point where he entered the water "the bottom descended gently for a number of feet. It then ...... suddenly deepened to some six feet." The holding of the case is succinctly stated in the headnote: "The presence of a pond in a park used by a traction company for picnic purposes does not impose upon the proprietor the obli-·gation to inform all comers by notice that they shall not bathe therein nor to post a guard to enforce an observance of such conduct. The absence of such guard or notice and the existence of the pond are not negligence. It is not to be considered a pitfall. There can be therefore no recovery for the loss of life of a boy, one of a school picnic party, who entered the pond with some of his companions to bathe and getting into deep water was drowned."

In *Ansell v. Philadelphia,* 276 Pa. 370, 120 A. 277, a boy fourteen years old was drowned by falling into a pond of water at the bottom of an abandoned quarry on land of the city taken for park purposes. A used roadway went the length of the pond but it was fenced

off by a two rail fence. The boy, however, had crossed this barrier. In sustaining a nonsuit, the Supreme Court said, at page 371: "We are not convinced of error; a pond, artificial or otherwise, does not differ from lakes and streams found everywhere, all of which are attractive to children and present common dangers. The owner of premises containing something attractive to children is not always liable in damages because of injuries to one yielding to the attraction; it depends upon the character of the thing in question, and a pond of water, guarded from the roadway like the one under consideration, cannot properly be placed in the same category with dangerous machines, electrical appliances and similar things."

It may be argued that the Ansell case is distinguishable on the ground that a fence separated the road from the pond. The fence, however, failed to prove an effective barrier in that case and there is no reason to believe that it would have prevented the accident in the case at bar.

It has been argued that the evidence that boys had been swimming in this pond for a period of several years without protest constituted a ground for distinguishing the Gillespie, Le Grand and Ansell cases, but we see no real basis for such a distinction. In the Gillespie case, the open well was in a place used as a resort and the drowned child was, therefore, a licensee or invitee, to whom the owner owed just as much duty as the Railroad Company owed Murdock in the case at bar. The same was true of the Le Grand case where the accident occurred in a public amusement park which charged admission to the plaintiffs' decedent.

In the Ansell case, the quarry was not shown to be a playground but it was upon the land of the city taken for park purposes, and the decision of the court was not based upon the fact that the plaintiff was a trespasser—which he obviously was not—but simply

upon the failure of the plaintiff to show that the owner of the premises was guilty of negligence. The court ruled that a pond of water could not "properly be placed in the same category with dangerous machines, electrical appliances and similar things." In other words, there was no duty to surround the pond with safeguards of any kind, and if such were true in the case of a quarry in a city park, how much clearer would it be in the case of a natural depression in a South Philadelphia wasteland a mile distant from the inhabited part of the city.

Section 340 of the Restatement of the Law of Torts, Vol. 2 states: "A possessor of land is not subject to liability to his licensees, whether business visitors or gratuitous licensees, for bodily harm caused to them by any dangerous condition thereon, whether natural or artificial, if they know of the condition and realize the risk involved therein."

Obviously Murdock knew at least as much about any dangerous situation which may be said to have existed at the pond, as did the defendant. The whole basis for liability is therefore lacking.

Furthermore, the boy was, by agreement of all the witnesses, a good swimmer and neither the submerged drum nor the "uneven bottom" contributed in any known way to the accident.

It is, of course, obvious that if there was imposed upon the defendant the requirement of guarding the pond where this drowning occured to avoid injury to boys who might swim there, it was likewise subject to the duty of placing guards at the literally innumerable streams, ponds, pools and rivers which border the thousands of miles of its right of way and in which boys customarily swim during the summer months.

If, as the court below suggested, the defendant should have drained the pond in question, then a reference to the photographs, will show that it was

likewise necessary for it to drain many acres more of swampland in South Philadelphia in which boys were swimming on its property—a none too easy undertaking, irrespective of whether these ponds were caused by rain water or seepage. Certainly as a matter of practicality, the precautions, which the plaintiffs insist that the railroad should have taken, were entirely disproportionate to the element of risk that was involved, when it is remembered that the plaintiffs' son and the other boys who came to the pond, all were able to swim.

In *Di Marco et al., v. Penna. R. R.*, 321 Pa. 568, 183 A. 780, the minor plaintiff had been playing ball on what was admittedly a playground on land of the defendant railroad company. The playground bordered on a ravine or cut, at the bottom ' of which were railroad tracks. Along the top of the ravine ran a path which plaintiff proved to be a permissive way. The minor, while looking for his ball, was standing in the path on the edge of the ravine, when it suddenly gave way, causing him to fall upon the tracks and to be run over by an approaching train. The Supreme Court refused to find that there was any negligence on the part of the defendant, since it was not required to improve the property for the protection of gratuitous licensees who were using the playground or permissive way. The following rules, which are in complete accord with the Restatement, were laid down at page 572: "We think it clear that defendant was likewise under no legal obligation to shore up the cut or to fence it in. Under the circumstances defendant could not, without giving proper warning, affirmatively increase the hazard, or carry on dangerous operations in disregard of the rights of users of the path: (citing cases); see Restatement, Torts, section 341. On the other hand, there being no hidden pitfall of which defendant had notice, there

was no duty owed to a mere licensee to put the premises in any better condition than they were in at the beginning of the permissive use: (citing cases); Restatement, Torts, section 342, comment c. Defendant was not obliged to effect the suggested improvements for the benefit of the minor plaintiff and other passers along the way ......

"We cannot believe that the obligation of ordinary care requires the taking of extraordinary and oppressive precautions. They would be entirely out of proportion to the risk involved."

Plaintiffs rely on the case of *Fitzpatrick v. Penfield*, supra, and various other cases dealing with the rights of children on so-called "playgrounds". An examination of this line of cases will disclose very clearly that they cannot be cited as authorities for a recovery at bar— first, because the pond in question did not come within the definition of a playground, and, secondly, because these cases only permit recovery where the land owner conducts dangerous activities on the property in disregard of the safety of his invitees. They do not require the land owner to improve the premises and make them safer than they were prior to the establishment of the playground.

In *Dalton et ux. v. Phila. & Reading Ry.*, 285 Pa. 209, 131 A. 724, plaintiff fell off a dock owned by the defendant and was drowned. An attempt was made to establish that the dock constituted a playground, but the court ruled that the "evidence was entirely too weak and indefinite to bring the premises within the playground rule."

In *Pietros et ux. v. Hecla Coal & Coke Co.*, 118 Pa. Superior Ct. 453, 180 A. 119, an eight year old child fell into a water hole on the defendant's mining property and was drowned. The hole had resulted from subsidence of the ground caused by mining and had been filled with water for only a few months prior to the

accident. It was six feet deep and fifteen feet in diameter, unguarded and plainly visible. Plaintiffs testified that boys habitually played around the premises of the defendant, but the court found that the evidence fell short of establishing a playground. While conceding that the boy might be a licensee, it was held that the evidence failed to disclose that defendant had violated any duty, the court saying at pages 459, 460: "The water hole was approximately fifteen feet from the lane leading out of the village or settlement. It was not sufficiently near the roadway to be a hazard to those going to and from the houses along the roadway. The photographs offered in evidence by the plaintiffs indicate that it was on the edge or outskirts of the opening in which the houses were situated. It was also unconcealed and plainly visible, and, although unguarded, could not be considered inherently dangerous and an attractive nuisance to children. What was said by Judge BALDRIGE in the case of *Dornick et ux. v. Wierton Coal Co.*, supra, (109 Pa. Superior Ct. 400, 167 A. 617) page 404, applies to the facts in the case at bar: 'It was not an object or instrumentality, by which, if left unguarded, a boy, with his natural curiosity to investigate, may, by playing with it, setting it in motion, or running against it, sustain an accident. Of course, a boy could and did fall into it, but such an accident may occur in any pond or stream.' "

In the cases where recovery has been permitted it will be found that the playground adjoined the home, factory or plant of the defendant, that the children dwelt in the immediate vicinity, and that the injury resulted from the existence of a dangerous machine or other instrumentality which the defendant operated without regard to the danger to children in the playground. See, *Daltry v. Electric Light, etc. Co.*, 208 Pa. 403, 57 A. 833; *Henderson v. Continental Refining Co.*, 219 Pa. 384, 68 A. 968; *Millum v. Lehigh etc., Coal*

*Co.*, 225 Pa. 214, 73 A. 1106; *O'Leary v. Pittsburgh & L. E. R. R. Co.*, 248 Pa. 4, 93 A. 771; *Carr v. Southern Pa. Tract. Co.*, 253 Pa. 274, 98 A. 554; *Balser v. Young*, 72 Pa. Superior Ct. 502; *Costanza v. Pittsburgh Coal Co.*, 276 Pa. 90, 119 A. 819; *Hogan et al., v. Etna Concrete Block Co.*, 325 Pa. 49, 188 A. 763.

The great weight of authority in other states is in accord with the Pennsylvania cases which deny recovery by the parents of children drowning in natural or artificial ponds. The governing principle is stated in 20 R. C. L., Neg. 85 as follows: "Ponds, pools, lakes, streams, and other waters embody perils that are deemed to be obvious to children of the tenderest years; as a general proposition no liability attaches to the proprietor by reason of death resulting therefrom to children who have come upon the land to bathe, skate or play ...... Although a property owner may know of the habit of children to visit waters upon his premises, he is as a rule under no obligation to erect barriers or to take other measures to prevent their being injured thereby."

The following cases are closely in point:

In *Thompson v. Illinois Central Ry.*, 105 Miss. 636, 63 So. 185, children had been accustomed to wade in a pond on the defendant's land along its right of way. Plaintiff's nine year old son waded out too far and was drowned in a deep hole. The court denied recovery, saying at page 651: "Here we have a generally shallow body of water covering a large area in the woods, a half mile from the inhabited parts of the town, wherein boys waded, and wherein appellant's boy was drowned. We think it must be conceded that this deplorable tragedy could not have been anticipated as probable by the exercise of reasonable forethought, nor could it have been prevented by any reasonable precautions. Of course, one could have anticipated the possibility of this sad event; but we think the

danger was comparatively remote. Scattered over the length and breadth of the land are innumerable ponds and lakes, artificial and natural; and occasionally a boy or man loses his life while wading, or bathing, in such body of water. If, as a matter of law, the owners of fish ponds, mill ponds, gin ponds, and other artificial bodies, wherein it is possible that boys may be drowned, can be held guilty of actionable negligence unless they inclose or guard same, few will be able to maintain these utilities, and to our minds an intolerable condition will be created."

In *Melendez v. Los Angeles*, 8 Cal. (2nd) 741, an eleven year old boy was drowned in a pool, which to the knowledge of defendant's officers had been used for several years as a playground for children. There was a deep hole concealed by the muddy condition of the water. In denying recovery the court quoted at page 745 from the earlier California case of *Peters v. Bowman*, 115 Cal. 345, 47 Pac. 113, frequently cited by other courts: "A body of water—either standing as in ponds and lakes, or running as in rivers and creeks, or ebbing and flowing, as on the shores of seas and bays—is a natural object incident to all countries which are not deserts. Such a body of water may be found in or close to nearly every city or town in the land; the danger of drowning in it is an apparent open danger, the knowledge of which is common to all; and there is no just view consistent with recognized rights of property owners, which would compel one owning land upon which such water, or part of it, stands or flows to fill it up or surround it with an impenetrable wall."

New York also has denied recovery under similar circumstances. See *Avery v. Morse*, 267 N. Y. S. 210, wherein the court approved the following language from the case of *Barnhart v. Chicago R. R.*, 89 Wash. 304, 307, 154 Pac. 441: "That many boys every year lose their lives by drowning is a matter of common

knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes, or streams for the purposes of play, swimming, and fishing, is comparatively small. It would be extending the doctrine too far to hold that a pond of water is an attractive nuisance."

We believe that the plaintiff failed to bring the instant case within the rule applicable to "playground", as the pond was in too remote a locality to charge defendant with notice of its use, and defendant was under no duty to improve its premises for the benefit of gratuitous licensees, and lastly the making of this and other similar bodies of water lying upon the defendant's property absolutely safe would cast an unreasonably great burden, out of proportion to the amount of risk involved, upon this defendant and other owners of similar land. We are also of the opinion that there was no negligence proved as to any duty owing to the deceased minor in view of the fact that he was a good swimmer.

The assignments of error are sustained, the judgment is reversed and now entered for the defendant.