## Jennings, Appellant, *v.* Glen Alden Coal Company.

Argued January 10, 1952. Before DREW, C. J., STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

*James Lenahan Brown*, with him *Daniel J. Flood, Joseph V. Kasper* and *Thomas F. Farrell, Jr.*, for appellants.

*J. H. Oliver*, with him *Arthur H. James, Gilbert S. McClintock* and *Franklin B. Gelder*, for appellee.

OPINION BY MR. CHIEF JUSTICE DREW, April 1, 1952:

The proper determination of this case rests on the application of Section 339 of the Restatement, Torts to the evidence presented at the trial. The learned trial judge held that plaintiff had failed to bring himself within the scope of that rule and accordingly entered a nonsuit. From an order denying a motion to remove the nonsuit, plaintiff has appealed.

On July 28, 1948, Edward Jennings, a minor then thirteen and a half years old, accompanied by several other boys, left his home in Hanover Township, Luzerne County, seeking work in Nanticoke Borough. Finding no jobs available they started to return home. En route they were joined by Edward Jennings' uncle, William Eckrote. Instead of following the highway they proceeded across land owned by defendant, Glen Alden Coal Company. On that land was a hole approximately

fifty feet in diameter which had resulted from defendant's strip mining operations and which had been allowed to fill with water to a depth of approximately twenty-five feet. Eckrote led the boys to this pool and suggested to them that they go swimming. Jennings, along with several others, went in the water and swam around for some time. He came out of the water then dove back in and started to swim across the pool again. When he reached a point near the far side of the pool he went down and was drowned. Eckrote, in an effort to save the boy, dove into the water and was also drowned.

James Jennings, the father of Edward and administrator of his estate, brought these actions to recover damages for his death. At the trial, in addition to the above facts, the testimony disclosed that defendant's land was wild and uncultivated and from the point where the pool was located to the nearest highway or habitation was at least one-half mile, although paths which had been used by defendant in its mining operations were still visible on the ground. It was also shown that on one or two previous occasions boys had been swimming in this pool. On the basis of this evidence plaintiff contends that the question of negligence is for the jury under the doctrine laid down in Section 339 of the Restatement, Torts which was expressly adopted by this Court in *Bartleson v. Glen Alden Coal Co.*, 361 Pa. 519, 64 A. 2d 846. The learned court below properly rejected this contention.

Section 339 provides: "A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and

which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein." All these requirements must be met before a possessor of land is liable for injuries to trespassing children: *Verrichia v. Society Di M. S. Del Lazio*, 366 Pa. 629, 79 A. 2d 237. Plaintiff's evidence falls far short of meeting that standard.

There is no evidence that defendant knew or should have known of the likelihood of children trespassing near the pool. It is true that there was a path which led from the highway to the pool but there is nothing to show that that path was used for any purpose after defendant ceased its mining operations. The path may have made trespassing possible but no duty arises out of mere possibilities. Likewise, the facts that a few people occasionally hunted or picked berries on the tract or even that children had on one or two occasions gone swimming in the pool does not prove defendant knew or had reason to know of the trespasses. This is merely a pool of water which had been used once or twice by boys for swimming. Certainly an owner of land cannot be charged with constructive notice of trespassing children on the basis of two widely separated visits.

The pool was in an isolated area a half mile from the nearest settlement and an equal distance from the nearest road. There is no evidence that children regularly played in this area or passed through it. This case is in no way analogous to *Bartleson v. Glen Alden Coal Co.*, supra, or *Thompson v. Reading Co.*, 343 Pa. 585, 23 A. 2d 729. In the *Bartleson* case children had

played within a hundred feet of the electric tower for ten years and in the *Thompson* case they had actually played on the turntable for the same length of time. Obviously in those cases the long continued and regular usage by the children constituted constructive notice to defendants. Such evidence is wholly lacking in this case.

An even more compelling reason for denying liability is found in clause (c) of Section 339 which states that "the children because of their youth do not discover the condition or realize the risk involved . . ." It certainly cannot be said that a normal boy thirteen and one-half years of age who has been in and around water often enough to have learned how to swim does not realize the risk involved in swimming in deep water. We have repeatedly held that the perils contained in a body of water are obvious to children at an early age: *Simon v. Hudson Coal Co.*, 350 Pa. 82, 38 A. 2d 259; *Murdock v. Pa. Railroad Co.*, 150 Pa. Superior Ct. 156, 27 A. 2d 405.

In this connection plaintiff places great stress on *Mussolino v. Coxe Bros. & Co., Inc.*, 357 Pa. 10, 53 A. 2d 93, and *Altenbach v. Leh. Val. R. R. Co.*, 349 Pa. 272, 37 A. 2d 429. In the *Mussolino* case a three year old child, while following a path regularly used by young children fell in an unguarded pond. In the *Altenbach* case a fence around a reservoir was allowed to fall into disrepair in an area where children played daily and a four year old boy crawled through the fence and was drowned. Those cases go no farther than to hold that where an artificial body of water is located in a place where extremely young children habitually play and is not supplied with an adequate safeguard to prevent children from falling in the water the owner is liable under Section 339. Here, as we stated above, children did not regularly play in the area; the boy was of at least average intelligence for his thirteen and a

half years; furthermore he did not fall into the water but deliberately dove in and went swimming. Under these circumstances Section 339 cannot apply for as is stated in comment e of that section "The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger." As this Court held in *Prokop v. Becker,* 345 Pa. 607, 29 A. 2d 23, The duty of a possessor of land to trespassing children does not extend to those conditions the existence of which is obvious even to children and the risk of which is fully realized by them. In the instant case, the boy was of sufficient age and understanding to fully appreciate the dangers inherent in the pool and no recovery can be allowed.

In so holding we are not, as plaintiff argues, finding as a matter of law that Jennings was guilty of contributory negligence. That question has no place in this case. The sole issue is whether defendant was under a duty to protect the boy from this type of accident. Under Section 339 that duty extends only to those children too young to appreciate the dangers involved. Such was not the case here and hence no duty was breached by defendant. Accordingly a nonsuit was properly entered.

Order affirmed.

——————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The learned trial Judge below erred in stating to the jury when he entered the nonsuit against the parent plaintiffs that—". . . If we were to permit a recovery in this case, we would have to impose upon the owners of land adjoining rivers, lakes, streams, ponds and pools of all kinds the burden of either drying up these waters or surrounding them with fences and the like to prevent

person from swimming in them, or holding them responsible for all deaths due to drowning while swimming in such waters."

There is no burden on the part of owners of land adjoining rivers and lakes to dry up the waters lapping at the shores of their holdings. Riparian owners along public streams owe no duty to swimmers, oarsmen or boatmen who use those waterways. But there is a definite responsibility on the part of a private landowner to use his land and all waters thereon so as not through negligence to visit harm upon others.

The defendant in the case at bar is a coal company engaged in strip mining in Luzerne County. This process of strip mining involves deep excavations, through which coal is removed; and, when the operation is completed, craters of varying sizes and depths are left in the surface of the earth. The crater which became the locale of the tragic accident involved in this lawsuit measured some 30 to 50 feet in diameter and some 25 feet in depth.

On July 28, 1948, Edward Jennings, thirteen and a half years old, with several other boys, went swimming in this hole, which had filled with water, and was drowned. As his body disappeared in the water, his uncle, William Eckrote (33 years of age) dived in to help him and he also drowned.

This double death, within the space of minutes, produces an inescapable inference that some hidden danger lurked in the waters of this unwrought pool. The court en banc below, in its opinion affirming the nonsuit, said: "Why they drowned was not shown." Appellee's counsel in their brief said that the decedent drowned "probably because he became exhausted due to overindulgence in the sport of swimming."

There is nothing in the record to support this assumption of exhaustion. On the contrary, the testi-

mony is all to the contrary. Edward Jennings was a strong, active, healthy boy who had never been seriously ill and who participated in athletics. The record is not clear as to how long the four boys swam in the water-filled crater before the tragedy, but it could only have been for a very short time. The witness Walter Paprota stated that the swimmers swam the pond a couple of times and then Edward decided to swim the pond once again. As the hole at no point was more than 30 to 50 feet across, it is unreasonable to suppose that a healthy boy could become exhausted swimming across the pool even 20 or 30 times. At the time the boy drowned he was only 8 to 12 feet from shore. And then, of course, we have the evidence of the fully developed adult, Eckrote, sinking to his death *immediately* after entering the pond.

Since, in considering a nonsuit, all inferences are to be drawn in favor of the plaintiff, the jury, had it been allowed to decide the facts in the case, could have concluded that Edward Jennings came to his death because some part of his body caught fast in the mud of the pool. The witness Walter Driscoll testified that William Eckrote (the uncle of the deceased) "sunk in the mud and didn't come up."

The lower Court, quoting Section 339 of the Restatement of the Law of Torts, pointed out wherein in its opinion the plaintiffs failed to meet the four conditions laid down in that section. A reading of the record indicates to me that the conditions *were* met: *(a) The place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass.*

The tract in question is one which would attract children. Amid considerable foliage and trees, it abounded in mushrooms, berries and rabbits, all attractive to boys of Edward's age. The lower Court said:

"The pool was not in a populated area; it was a half mile from the nearest settlement, Loomis Park." But certainly a half mile is not distant for a healthy $13\frac{1}{2}$ year old boy. Furthermore, three paths led over the tract and an unused but usable automobile road went by the strip hole in question. It was also testified that boys played football and baseball close to the site of the strippings.

*b. The condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children.*

There was evidence in the case that on previous occasions children had used this pool for swimming; and the defendant knew or should have known that a ragged cavity of this character with its muddy tentacles could pull to disaster an unwary child. The fact that it dragged to his death a grown-up man wholly cognizant of the danger is evidence of the serious, if not lethal, danger inherent in this body of water.

*c. The children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it.*

Perhaps there is no spot more enticing to the average rural American boy in mid-summer than a cool body of water in which to splash and frolic with the carefreeness that only boyhood can know. No one understood and felt the boyhood of rustic America better than James Whitcomb Riley who enshrined the old swimming hole in his deathless verse:

"Oh! the old swimmin'-hole! In the long lazy days
When the humdrum of school made so many run-a-ways
How pleasant was the journey down the old dusty lane,

. Whare the tracks of our bare feet was all printed so plane

You could tell by the dent of the heel and the sole

They was lots of fun on hand at the old swimmin'-hole."

To charge a hearty, vigorous American lad with knowledge of risk or fear of consequences in indulging in the most natural sport of a boy's summer ,is to say that he must be cautious in eating cherries or apples or playing "Run Sheep Run."

*d. The utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein.*

The defendant ,company enjoyed no utility in maintaining this water-filled stripping hole, but it saved itself an inconvenience in not doing something to prevent its being used by children. Its ,negligence lay in not having undertaken that inconvenience and in not hav-.ing met its responsibility of shutting off the danger from children by ,erecting a fence or barrier or, at least, by posting signs warning all wayfarers, young and old, of the serious perils involved in approaching the water-filled crater.

The defendant company could well have anticipated the likelihood of an occurrence similar to what occurred, and, in the light of that reasonable anticipation, it failed in its duty to the public.

There is no evidence that Edward Jennings appreciated the full risk involved in swimming in .the flooded crater. To him it was simply a swimmin' hole; to.the owner, with knowledge of its properties, it was a ·death trap and should have been shut- off from the public. There can be no doubt that the owner of land would be liable in damages if a child were injured or killed by an amphibious animal concealed in the water

and known to be there by the owner, but not known to the child swimmer.

Under section 339 of the Restatement of Torts, the comment is advanced that a railroad company would be liable for injuries done children on a turntable if it could "by a simple locking device" make the premises safe for children. Also "while wires are necessary to carry high-tension electric current, the burden of properly insulating wires maintained at places where trespassing children may be expected to come in contact with them, is obviously slight as compared with the gravity of harm which they threaten and the chance that such harm will result." The burden to the defendant company in this case of shutting off this flooded crater was slight in comparison with the gravity of harm which it threatened and, as it turned out, accomplished.

The case of *Bartleson v. Glen Alden Coal Co.*, **361** Pa. 519, 64 A. 2d 846, has been quoted by the lower court and by the majority of this Court to the plaintiff's disadvantage. It is true that the facts there are quite different from the ones before us here but the principle involved in that case does not suffer when applied to the situation in this case. The Bartleson case involved a dangerous tower which the trespassing minor plaintiff climbed to his injury. Here we have a dangerous pool in which the minor decedent swam to his death. In that case the Supreme Court said at page 527: "The modern rule, applicable in such circumstances, limits unrestricted use of land in the interest of safeguarding children from the danger of serious injury. So long as defendant can be charged with the duty to anticipate trespassing children, that they will accept the invitation to enter the enclosure and climb the tower it cannot remain passive."

At page 529 the Court said: "That children will accept a situational invitation to climb is a matter of

common knowledge." That children will accept a situational invitation to swim is equally a matter of common knowledge.

The Court said further at page 529: "The tower was not so obviously dangerous that the child must be deemed to perceive the risk involved as though he were an adult. Defendant coal company should have anticipated that children would not observe or fully appreciate the inherent danger in its electrical apparatus."

In this case the pool was not so obviously dangerous that a child must be deemed to have perceived the risk involved as though he were an adult.

As I read the cases, there has been a steady effort in law toward establishing a greater appreciation of human life and a higher responsibility on the part of people toward other people. This advance has not been continuous or regular, but important decisions have been rendered which hold the development on its course, and although from time to time a decision seems to retard this progress, in the main the responsibility toward increased care has gained considerably. Particularly is this true where children may be the potential victims of negligence and want of care.

This Court said in the case of *Thompson v. Reading Co.*, 343 Pa. 585, 599, 23 A. 2d 729: "Young children have no foresight and scarcely any apprehensiveness of danger. This is a circumstance which those owning instrumentalities potential for harm must bear in mind, for it is every individual's duty to use toward others what due care *then* and *there* requires. The question whether or not injury to a child legally incapable of negligence will import negligence to the owner or possessor of the injuring instrumentality depends on the circumstances. . . ." While the instrument there involved was a turntable, the applicable principle does

not change where the instrumentality is a water-filled crater. Justice MAXEY (later Chief Justice) said in that case: "The attractiveness and comparative accessibility to children of a potentially dangerous instrumentality are circumstances by which the owner's want of care is tested. If it is *in fact in*accessible, no want of care can be imputed to its owner. But if it is only *apparently inaccessible* but *in fact* accessible to children, and the owner knows this or ought to know it he exhibits negligence if he fails to do those simple things which would make it harmless."

Certainly it cannot be said in this case that the swimming hole was inaccessible to Edward Jennings, nor can it be said that the owner did not know that the swimming hole was accessible to children.

The spontaneity of children in responding to invitation to play, without calculating the risk, is as well known as the sequence of the seasons or the regularity with which night follows day. It is not an imponderable, or a matter of speculation. It is simply fact.

As far back as 1877 Chief Justice AGNEW of the Supreme Court, discussing a case where a six-year old child was injured by the fall of a platform, suspended in a private alley in such a manner as to arouse the curiosity of children, said: ". . . Now, can it be righteously said that the owner of such a dangerous trap, held by no fastening, so liable to drop, so near a public thoroughfare, so often open and exposed to the entries of persons on business, by accident, or from curiosity, owes no duty to those who will be probably there? The common feeling of mankind, as well as the maxim *sic utere tuo, ut alienum non laedas,* must say this cannot be true—that this spot is not so private and secluded as that a man may keep dangerous pits or deadfalls there without a breach of duty to society. On the contrary, the mind, impelled by the instincts of the heart, sees

at once that in such a place, and under these circumstances, he had good reason to expect that one day or other some one, probably a thoughtless boy in the buoyancy of play, would be led there, and injury would follow—especially, too, when prompted by knowledge that a fastening was needed . . . Such, too, is the humanity of the law, that one may not justifiably, or even excusably, place a dangerous pitfall, a wolf-trap, or a spring-gun, purposely to catch and injure even wilful trespassers poaching upon his grounds. The common feeling of mankind . . . and the common sense of jurors, must be left, in such a case, to pronounce upon the facts . . ." (*Hydraulic Works Co. v. Orr*, 83 Pa. 332, 336.)

In *Bisson v. John B. Kelly, Inc.*, 314 Pa. 99, 110, 170 A. 139, the Supreme Court said: "It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others. This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable. A normal human being is held to foresee those injuries which are the consequence of his acts of omission or commission which he, as a reasonable human being, should have foreseen. The question whether a person charged with negligence or negligent acts or omissions should have foreseen the injuries resulting from those acts or omissions is for the jury, if there is any credible evidence from which a reasonable conclusion can be drawn in support of the claim of neglect of duty."

In *Weiner v. Westm'd Water Co.*, 127 Superior Court 201, 204, 193 A. 665, Judge BALDRIGE said: "The so-called playground or attractive nuisance doctrine has been firmly established in our jurisprudence. The latest case of our Supreme Court recognizing this rule

is Hogan et al. v. Etna Concrete Block Co., 325 Pa. 49, 188 A. 763, which cites a number of previous decisions. It is there pointed out that if children are wont to go on premises to play or for other purposes, and the owner thereof maintains attractive appliances or artificial conditions which create a danger, and does not express his disapproval of their presence, he is legally bound to use ordinary care."

This proper solicitude for children, of course, should not visit harm upon persons innocent of fault. For instance, in the case of *Dolena v. Pittsburgh Terminal Coal Co.*, 324 Pa. 228, 188 A. 112, a seven year old boy climbed 20 feet up the side of a water tank, fell in and was drowned. This Court said: "The defendant had the right to maintain the tank on its property and could not be required to anticipate that a lad of seven years who could not swim would climb up and fall into it."

But while the owner of a water tank is not expected to foresee that a child will climb 20 feet up the perpendicular side of a tank and fall in, it is not too much to expect that the defendant company here could foresee that an open pool on the surface of the land in the heat of mid-summer would be attractive to a 13½ year old boy.

Since the whole problem is one of reasonableness and good sense, and not of technical and professional analysis, the jury is the most natural and logical tribunal to determine whether a property owner in a given case has met the duty required of him not to carelessly or recklessly injure his fellow-men. Of course, where he has discharged that duty and responsibility to the point where reasonable individuals could not differ on it, there would be no point in submitting the case to the jury. That case, however, is not here.

Negligence is simply the want of care in the cir-
cumstances. In *Pope v. Reading Co.*, 304 Pa. 326, 333,
156 A. 106, Chief Justice MAXEY said: "At common law
it was held that every man must have some knowledge
'of the quality of his beast' (1 Hale P.C. 430) and use
appropriate means to keep that beast from harming
people. Public welfare requires that this same salutary
rule apply to the inanimate objects in a man's possession
and subject to his intelligent control. . . . When a per-
son dams a large body of water at a point in a valley
above human habitations, he is chargeable with the
knowledge that pressure of that body of water will be
exerted against that dam, and if it overcomes it the
water will rush down into the valley, carrying death
and destruction. Therefore, he must so build and
maintain his dam as to withstand the water's pressure."

When the defendant company abandoned the exca-
vation from which it had extracted coal, it was charge-
able with knowledge that eventually it would fill with
water, from rain, drainage or seepage or all three.
And it knew that boys frequented the area and it could
not be so obtuse as to dismiss from mind the thought
that children would want to bathe, disport and swim in
such accumulated water on hot summer days.

That the accumulation of water in abandoned strip-
ping holes may constitute a hazard to public safety has
been recognized by our State legislature and therefore
could not be unknown to the defendant company. See
Anthracite Strip Mining Law, P. L. 1095, 52 P.S. 681.1-
681.22.

Although not stating it in so many words, the lower
Court found Edward Jennings guilty of contributory
negligence as a matter of law. In this we believe the
Court erred. Being dead, there is the presumption
that Edward Jennings exercised proper care in the
circumstances. *Kulka v. Nemirovsky*, 314 Pa. 134, 170

A. 261. Furthermore, when the victim of the accident is less than 14 years of age, it is only in the rarest of instances that the Court may declare him contributorily negligent as a matter of law. That instance is certainly not here. As stated in *Di Meglio v. Phila. & R. Ry. Co.*, 252 Pa. 391, 393, 97 A. 476: "A child's capacity is the measure of his responsibility, and if he has not the ability to foresee and avoid danger to which he may be exposed, negligence will not be imputed to him if he unwittingly exposes himself to it." *Philadelphia City Pass. Ry Co. v. Hassard,* 75 Pa. 367. The degree of care and discretion required to be exercised by him is such as is ordinarily to be expected of a child of his age and experience, and if so found to exist it imposes on him responsibility for his negligent acts. And this is a matter for the jury to determine.

In *Bowman v. Stouman,* 292 Pa. 293, 141 A. 41, this Court held that the question of the possibility of contributory negligence being committed by a boy eleven years of age was for the jury.

Appellants also complain of the exclusion from the trial of certain photographs showing the pool and surrounding area. The lower Court says in its opinion that even if admitted, "they would not have changed the Court's ruling on the motion for nonsuit." Since the Court actually saw the photographs we must assume, in the present state of the record, that their exclusion did not play a vital part in the court's decision. However, in the event of a retrial, I believe that the photographs should be submitted to the jury with instructions regarding the minor change in the appearance of the locale from what it was when the accident occurred.

In *McCracken v. Curwensville Boro.,* 309 Pa. 98, 114, 163 A. 217, the Supreme Court declared: " 'It is an established principle that if there is any credible evidence from which a reasonable conclusion can be drawn

in support of the claim of either party in the trial of a case, the question must be left to the jury. . . . . . A verdict should not be directed if on all the facts and circumstances there is room for fair and sensible men to differ in their conclusions, or, as it is sometimes stated, [if] the evidence is not such that honest minds could reach but one conclusion': 26 R.C.L., pages 1067, 1069, section 75."

While to me it is crystal clear that the defendant failed to measure up to the standard of care required under the circumstances, there can be no doubt that the evidence was not such that honest minds could reach but one conclusion of non-negligence. Therefore, under the authority of *McCracken v. Curwensville Boro.*, just cited, justice, law, logic and fair play dictate that the issue in this case should go to a jury.